In re Patricia J. WOLLIN, Debtor.

Steven L. Moody and Cynthia K. Moody, Debtors.

Nos. 699–63363–aer13, 699–63364–aer13.

United States Bankruptcy Court, D. Oregon.

June 2, 2000.

Howard Lichtig, Port Orford, OR, for Debtors.

Harold B. Scoggins, Farleigh, Wada & Witt, Portland, OR, for Creditor.

Ronald Becker, Eugene, OR, for trustee.

## MEMORANDUM OPINION

ALBERT E. RADCLIFFE, Chief Judge.

These matters come before the Court on Oregon Federal Credit Union's (OFCU's) objections to confirmation and the debtors' objections to OFCU's proofs of claim.

**Procedural History:**

On June 7, 1999, Steven and Cynthia Moody (Moody) filed their Chapter 13 petition. On that same day, Patricia Wollin (Wollin) also filed a Chapter 13 petition. OFCU filed a secured claim in each case. Both the Moodys and Wollin filed Chapter 13 plans proposing to modify OFCU's secured claim.

In each case, OFCU objected to confirmation and the debtors objected to OFCU's proof of claim. The two cases are factually similar, and share the same legal issues.

At a joint hearing on confirmation and the claims objections, the parties stipulated to the values of certain vehicles securing OFCU's claim. The parties also filed a "Stipulation of Facts". The Chapter 13 Trustee recommended confirmation in both cases. At the hearing's conclusion, the Court took the matters under advisement. Since then, the Court has received correspondence from the Moodys' counsel as to a stipulation reached regarding the disposition of a vehicle representing part of OFCU's collateral.

**Facts:**

**Moodys:**

On February 7, 1992 OFCU gave Steven Moody a $3,000.00 LoanLiner line of credit. No security, except a $5.00 pledge of credit union shares, was given. On April 26, 1996 OFCU gave the Moodys a $3,900.00 advance pursuant to a "LoanLiner Application and Credit Agreement" and an "Advance Request Voucher and Security Agreement." The loan was to consoli-

date debts. To secure this loan, the Moodys gave OFCU a security interest in a 1978 Ford Bronco (the Bronco). The Moody's have agreed to surrender the Bronco, and OFCU has waived any deficiency claim.[1]

On July 30, 1996 OFCU gave the Moodys a $31,850.50 advance pursuant to another "LoanLiner Application and Credit Agreement" and "Advance Request Voucher and Security Agreement." This loan was to purchase a 1996 Ford F350 pickup truck(the Pickup). To secure this loan, the Moodys gave OFCU a security interest in the Pickup. The Pickup's replacement value is $23,630.00.

In December, 1998 OFCU issued a visa card to Steven Moody.[2]

**Wollin:**

On April 30, 1988 OFCU gave Wollin a $2,000.00 line of credit. In May, 1988 OFCU issued a visa card to Wollin.

On July 17, 1996 OFCU gave Wollin a $9,000.00 advance pursuant to a "LoanLiner Application and Credit Agreement" and an "Advance Request Voucher and Security Agreement." The loan was to purchase a 1995 Ford Probe (the Probe).[3] To secure the loan, Wollin gave OFCU a security interest in the Probe. The Probe's replacement value is $9,341.00.[4]

**Common Facts:**

The vehicle loan security agreements all contained identical "dragnet" clauses, dis-

cussed below. OFCU maintains a perfected security interest in the vehicles. OFCU did not discuss any cross-collateralization rights with the debtors at the time of any of the above loan transactions. The debtors did not read their loan documents and were unaware of the cross-collateral rights asserted by OFCU at the time of each advance.

When OFCU is asked to release collateral granted by one of its members under loan agreements, like those governing the Moodys' and Wollin's accounts, OFCU reviews whether the member is in default on other loans secured by the collateral. If there is no default, OFCU generally releases the collateral. If one or more of the other loans are in default, OFCU generally does not release the collateral.

**Issue:**

The question presented is whether the vehicles secure the "non-vehicle" loans. In addressing this question, the Court must examine the enforceability of the "dragnet" clause in each "Advance Request Voucher and Security Agreement" as it relates to debt incurred both subsequent and antecedent thereto. State law (here Oregon) controls these issues.

**Discussion:**

The dragnet clause provides in pertinent part as follows:

The security interest secures the advance and any extensions, renewals or

---

1. The Bronco's surrender was agreed to after the Court took the matters at bar under advisement. The surrender does not however moot the issues regarding the debts secured by the Bronco, as there is a possibility, (admittedly remote), that a sale on repossession could garner more than the primary debt against the Bronco.

2. Although not in the Stipulation, OFCU's proof of claim reflects the balances as of the petition date on the line of credit, Bronco Loan, Pickup Loan, and Visa card as $3,018.50, $1,870.94, $21,614.18, and $2,342.60 respectively. The Moodys did not present any evidence contradicting these figures at the hearing. As such, under FRBP 3001(f), the Court adopts OFCU's figures.

3. The July 1996 loan secured by the Probe, as well as the April and July 1996 loans to the Moodys, secured respectively by the Bronco and Pickup, will collectively be referred to as "the vehicle loans." All other loans will be referred to collectively as the "non-vehicle loans."

4. Although not in the Stipulation, OFCU's proof of claim reflects the balances as of the petition date on the line of credit, VISA card, and Probe loan as $2,919.04, $1,989.00 and $5,045.81 respectively. Wollin did not present any evidence contradicting these figures at the hearing. As such, pursuant to FRBP 3001(f), the Court adopts OFCU's figures.

refinancings of the advance. It also secures any other advances you have now or receive in the future under the LO-ANLINER Credit Agreement and any other amount you owe the credit union for any reason now or in the future.[5]

### A. Subsequent Loans (VISA charges in Moody):

OFCU argues the dragnet clause should be enforced under ORS 79.2010 [6] according to its plain meaning. Thus, because the Moody VISA charges are "any other amount" owed "in the future", the Bronco and Pickup secure the charges. In the alternative, OFCU argues the VISA charges are of the "same class" as the Bronco and Pickup loans, because they all were consumer debt. Thus, the VISA charges are secured by these vehicles. For the reasons set forth below, the Court rejects both of these arguments.

■ The law in Oregon is well-settled regarding the standard for bringing *future* debt into a dragnet clause.[7] As stated by the Oregon Supreme Court, "no matter how the clause is drafted, the future advance to be covered must 'be of the same class as the primary obligation...and so related to it that the consent of the debtor to its inclusion may be inferred.'" *Community Bank v. Jones*, 278 Or. 647, 666, 566 P.2d 470, 482 (1977) (quoting with approval, *National Bank of Eastern Arkansas v. Blankenship*, 177 F.Supp. 667 (E.D.Ark.1959), *aff'd sub nom.*, *National Bank of Eastern Arkansas v. General Mills, Inc.*, 283 F.2d 574 (8th Cir.1960))(emphasis added). Thus, the Oregon Supreme Court has clearly rejected the "plain meaning" argument that OFCU proffers.

Concerning debts which meet the "same class" test, at least in the business loan context, the courts have construed the Oregon standard with some variation. *Compare Community Bank, supra* (loan to satisfy overdraft on business checking account was not related to prior floor financing loan in which security was given, even though both loans were for business purposes), *with Lansdowne v. Security Bank of Coos County (In re Smith & West Construction, Inc.)*, 28 B.R. 682 (Bankr.D.Or. 1983) (holding that loans of a business nature, all evidenced by promissory notes, were of the same class).

The Court could find no Oregon authority applying the "same class" standard in the consumer loan context. Other jurisdictions have taken a variety of approaches. Some have held that all consumer debts meet the test. *E.g., In re Johnson*, 9 B.R. 713 (Bankr.M.D.Tenn. 1981) (applying Tennessee law).[8] Others have held that if the primary loan is for a purchase money transaction, then only subsequent purchase money loans meet the test. *E.g., Dalton v. First National Bank of Grayson*, 712 S.W.2d 954 (Ky. App.1986) (applying Kentucky law). Finally, some courts appear to require that each consumer transaction be for the same specific use, and not be evidenced by separate debt instruments. *E.g., In re Grizaf-*

---

**5.** A similar clause is found in each "LoanLiner Application and Credit Agreement" as follows:

> Property given as security under this Plan or for any other loan will secure all amounts you owe the credit union now and in the future.

**6.** ORS 79.2010 provides in pertinent part:

> Except as otherwise provided by the Uniform Commercial Code a security agreement is effective according to its terms between the parties....

**7.** Future advances may be swept into security agreements under ORS 79.2040(3), which provides in pertinent part:

> Obligations covered by a security agreement may include future advances or other value....

> However, as discussed below, the standards for sweeping in future advances are court imposed.

**8.** The *Johnson* holding was subsequently superseded by statute, as recognized in *In re Willie*, 157 B.R. 623 (Bankr.M.D.Tenn. 1993)(The Tennessee legislature eliminated the "same class" standard).

*fi*, 23 B.R. 137 (Bankr.D.Colo.1982) (applying Colorado law).

It appears that the Oregon Supreme Court would apply at least as strict an interpretation of the "same class" test in the consumer context as in the business context.[9] In *Community Bank, supra*, the plaintiff bank, over a period of years, provided inventory flooring financing for defendant Jones' automobile business. Jones gave back a security interest in his inventory, with the collateral securing all "notes." Jones then began issuing overdrafts on his business checking account, which the bank honored for a time. When Jones began experiencing financial difficulties, the bank refused to pay on the overdrafts, having decided it would only pay on collected funds. It did however, give Jones a loan, evidenced by a trust receipt, which was credited directly to Jones' overdrawn checking account. The issue in the case was whether this latter loan was covered by the "notes" language in the inventory security agreement. The Oregon Supreme Court found the reference to "notes" included trust receipts. It held, however, that the "same class" test had not been met, even though both the flooring loans and the trust receipt were business related. It explained:

> The only practical effect of this transaction [the trust receipt] was to reduce a portion of the previously unsecured debt created by the overdrafts against Jones' checking account. Unlike the other monies loaned pursuant to the security agreement, the December 17 transaction gave Jones no financing with which to floor new inventory.

Although this transaction appears in form to conform to the security agreement, we find its substance to be different in kind and not related to the purpose intended by the parties when they entered into the October 28 security agreement. (Parenthesis Added).

*Id.* at 666, 566 P.2d at 482.

■ This Court used similar reasoning to enforce a dragnet clause in *In Re Bear Cat Logging, Inc.*, Case # 693–60940–aer11 (Bankr.D.Or. April 18, 1994) (unpublished) (Radcliffe, J.) finding that leases and loans met the standard where they were all for the purpose of enabling the debtor to acquire heavy logging equipment and vehicles to be used in the debtor's business. Under the *Community Bank* standard, loans of the same general category (i.e., all business loans or all consumer loans) do not necessarily meet the "same class" standard.

■ This Court also declines to adopt a per se test based on the status of the loans as purchase money transactions. The future transaction must be "so related to" the primary loan "that the consent of the debtor to its inclusion may be inferred." *Community Bank, supra*. Here, the Court cannot find the VISA charges (while presumably purchase money), sufficiently related to the Pickup loan.[10] A loan to purchase a vehicle differs both in scope and solemnity from the miscellaneous charges typical of a VISA account. The Court cannot infer the Moodys' consent to have their vehicles secure the VISA account.

B. *Antecedent Loans: (February 1992 Line of Credit in Moody); (April 1988 Line of Credit, and VISA charges in Wollin):*

Regarding the loans which were antecedent to the vehicle loans, OFCU again argues that the plain meaning of the dragnet clauses should be applied. The debt-

---

9. Some courts have noted that dragnet clauses may be more strictly construed in the consumer context, because of the parties' unequal bargaining position. *E.g. Bank of Kansas v. Nelson Music Company, Inc.*, 949 F.2d 321 (10th Cir.1991)(applying Kansas law).

10. Neither can the Court find the VISA charges sufficiently related to the Bronco loan, the purpose of which was to "consolidate debt."

ors, on the other hand, argue that antecedent loans must be specifically referenced in the dragnet clauses to be enforceable.

The Court finds no Oregon authority directly on point. Elsewhere, courts are split. A significant number (perhaps a majority) apply the "plain meaning" test urged by OFCU. *E.g., Stannish v. Community Bank of Homewood–Flossmoor*, 24 B.R. 761 (Bankr.N.D.Ill.1982) (applying Illinois law); *First National Bank v. First Interstate Bank*, 774 P.2d 645 (Wy.1989) (applying Wyoming law). Others apply the "same class" standard. *E.g., Potomac Coal Co. v. $81,961.13 in the Hands of an Escrow Agent*, 451 Pa.Super. 289, 679 A.2d 800 (1996) (applying Pennsylvania law). Still others have demanded that the dragnet clause specifically reference any antecedent debt (the "specific reference" standard). *E.g., National Bank of Eastern Arkansas v. Blankenship*, 177 F.Supp. 667 (E.D.Ark.1959), *aff'd sub nom., National Bank of Eastern Arkansas v. General Mills, Inc.*, 283 F.2d 574 (8th Cir.1960) (applying Arkansas law); *In re Hill*, 210 B.R. 1016 (Bankr.E.D.Wis.1997) (applying Wisconsin law); *Lundgren v. National Bank of Alaska*, 756 P.2d 270, 278 (Alaska 1987) (applying Alaska law).[11]

As with future advances, this Court rejects the "plain meaning" test as to antecedent debt. The Oregon Supreme Court has adopted a standard stricter than "plain meaning" for future advances. This Court cannot conclude that it would lessen that standard for antecedent debt, especially in the consumer context.[12] Instead, guided by the policy that dragnet clauses are generally disfavored and strictly construed, this Court adopts the "specific reference" standard as divining the parties' true intent and comporting with sound public policy. As the Alaska Supreme Court notes:

> A key rationale underlying these holdings is that since the antecedent debt is already owed by the borrower to the lender, the parties would have had no good reason not to identify it in the subsequent security instrument if they had truly intended the deed of trust or mortgage to cover it.

*Lundgren, supra* at 278.

Here, the antecedent debts are not specifically referenced, as such, the vehicles do not secure them.[13]

---

**11.** At least one court has adopted a multi-level inquiry, including the "same class" and "specific reference" standards. *See Wallace v. United Mississippi Bank*, 726 So.2d 578 (Miss.1998)(applying Mississippi law).

**12.** See fn. 9.

**13.** One other issue was cryptically briefed and argued by the parties, that is, the enforceability of the cross-collateral clauses in the VISA agreements themselves.

In Moody, the VISA cross-collateralization clause provides as follows:

> You grant the Credit Union a Security interest in all existing and future funds of your accounts with the Credit Union to secure advances under the VISA Credit Card Agreement. You further acknowledge that this VISA account is cross collateralized with any Loan Liner subaccount.

Initially, it must be noted that the VISA agreement, both at the top, in the type of account applied for, and at the bottom, in the type of account approved, indicates the card was a "debit" card. Under the agreement the cross-collateral clause only applies to a "credit" card. Thus, it is arguable whether the clause even applies. Assuming it does, the clause cannot be read to identify the vehicles (generically or specifically) as collateral.

In Wollin, the VISA cross-collateralization clause, provides:

> To secure your account you grant us a purchase money security interest under the Uniform Commercial Code in any goods you purchase through the account. . . . With respect to this account only, we will not assert any statutory right we may have if you are in default to prevent withdrawal of your unpledged Credit Union shares below the unpaid balance of your account. However *if you have given* us a specific pledge of your Credit Union shares or any other security interests for all your debts, your account will also be secured by your pledged shares and the property described in those other security agreements. (emphasis added)

The operative language, "if you have given", denotes past, not future tense. As the

**Conclusion:**

Based upon the foregoing, OFCU's objections to confirmation should be overruled and the debtors' objections to OFCU's claims should be sustained, an order consistent herewith shall be entered.

This opinion constitutes the Court's findings of fact and conclusions of law pursuant to FRBP 7052. They shall not be separately stated.

Probe loan was executed after the VISA agreement, the clause is ineffective to secure the VISA charges with the Probe.